UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARK  JAMAL KEARNEY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-39 |
| | § | |
| GARY L CURRIE, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATIONON DEFENDANT
MONROE'S MOTION FOR SUMMARY JUDGMENT**

In this prisoner civil rights action, Plaintiff Mark Jamal Kearney challenges certain practices and policies of the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) on the grounds that they violate his First Amendment right to practice his Muslim faith, and also his statutory rights under the Religions Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §. 2000cc.  In addition, Plaintiff is suing Carol E. Monroe, the warden of the McConnell Unit (MCU), in his individual capacity for monetary damages, alleging that Defendant Monroe violated his due process and Eighth Amendment rights in regards to Plaintiff's placement in a solitary cell following disciplinary charges.

Pending is Defendant Monroe's motion for summary judgment.  (D.E. 54). Warden Monroe claims that he is entitled to judgment in his favor on Plaintiff's claims because he is entitled to qualified immunity.  *Id.*  Plaintiff has filed a response in opposition.  (D.E. 59), to which Warden Monroe has filed a reply.  (D.E. 60).

For the reasons stated herein, it is respectfully recommended that summary judgment be granted in favor of Warden Monroe and that Plaintiff's claims against this Defendant be dismissed with prejudice.

## I.   JURISDICTION.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

## II.   PROCEDURAL BACKGROUND.

Plaintiff is a prisoner in the TDCJ-CID and is currently housed at the MCU.

On February 5, 2013, Plaintiff filed his original complaint and named the following individuals as Defendants: (1) Brad Livingston, the TDCJ Executive Director; (2) William Stephens, the TDCJ-CID Director;[1] (3) MCU Warden Gary L. Currie; (4) MCU Warden Carol E. Monroe; and (5) Warden L. Clark, the Region IV Director.  (D.E. 1, p. 3).

On March 14, 2014, a *Spears*[2] hearing was conducted, following which it was recommended that Plaintiff's First Amendment and RLUIPA claims seeking prospective injunctive relief be retained against Defendants Livingston and Stephens in their official capacities, and that Plaintiff's due process and Eighth Amendment claims be retained against Warden Monroe in his individual capacity only.  (D.E. 9).  It was recommended

---

[1] Plaintiff named former TDCJ Director Rick Thaler as a defendant; however, William Stephens is the new TDCJ-CID Director and he was substituted as the proper party defendant.

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

that Plaintiff's claims against Warden Currie and Warden Clark be dismissed for failure to state a constitutional violation as Plaintiff complained only that these Defendants denied his grievances, and it was recommended that all claims for money damages against Defendants in their official capacities be dismissed as barred by the Eleventh Amendment. *Id.* Plaintiff did not file objections to the recommendation, and on June 23, 2014, the Court adopted the recommendation. (D.E. 10). The Court retained Plaintiff's RLUIPA and First Amendment claims for injunctive relief against Livingston and Stephens in their official capacities but stayed those claims pending their resolution in a similar action, *Ali v. Stephens,* Case No. 9:09-cv-052 in the United States District Court for the Eastern District of Texas, Lufkin Division. *Id.* The Court retained Plaintiff's due process claim and Eighth Amendment excessive heat claim against Warden Monroe in his individual capacity. *Id.* All remaining claims were dismissed. *Id.*

On July 23, 2014, the Office of the Attorney General (OAG), as *Amicus Curiae,* notified the Court that Plaintiff's Eight Amendment excessive heat claim could potentially be related to pending Multidistrict Litigation styled, *In re Texas Prison Heat Litigation,* MDL Case No. 2569. (MDL 2569). (D.E. 15).

On July 24, 2014, the OAG filed a motion to sever Plaintiff's heat claims (D.E. 16), and on July 28, 2014, the OAG filed a notice of appearance in MDL 2569. (D.E. 17).

On August 8, 2014, Warden Monroe filed his Answer. (D.E. 19).

On August 15, 2014, Plaintiff filed a motion for appointment of counsel, motion to transfer case, and motion to consolidate.  (D.E. 21).

On September 8, 2014, Plaintiff filed his First Amended Complaint and named as defendants Gary L. Currie, William Stephens, Brad Livingston, Rick Thaler, and Eileen Kennedy.  (D.E. 23).

On September 11, 2014, Defendant Monroe filed an Amended Answer to Plaintiff's First Amended Complaint.  (D.E. 24).

By Order entered November 28, 2014, the OAG's motion to sever and transfer Plaintiff's excessive heat claim was denied, as was Plaintiff's motion to transfer and consolidate.  (D.E. 29).  In addition, the stay was lifted as to the RLUIPA/First Amendment litigation.  *Id.* at 6-7.  Plaintiff's motion to amend to add Rick Thaler, Gary Currie, and Eileen Kennedy as defendants was denied.  *Id.* at 6.

On December 10, 2014, Plaintiff filed a motion for a preliminary injunction/temporary restraining order (TRO) to be permitted to wear a one-half inch beard based on the holding in *Ali v. Stephens,* wherein the Lufkin district court held that the TDCJ's no-beard policy violated RLUIPA.  (D.E. 31).

On December 22, 2014, Defendants Livingston and Stephens filed an Answer to Plaintiff's first amended complaint.  (D.E. 32).  Also on that date, Defendants Monroe, Livingston and Stephens filed a motion to stay Plaintiff's RLUIPA/First Amendment claims pending the Supreme Court's resolution of *Holt v. Hobbs*, 135 S. Ct. 853 (2015), wherein the high Court was to address the Arkansas Department of Correction's no-beard grooming policy under RLUIPA.  (D.E. 33).

On February 24, 2015, the Court stayed Plaintiff's First Amendment/RLUIPA claims against Defendants Livingston and Stephens pending the *Hobbs* decision, while Defendant Stephens and the TDCJ agreed to allow Plaintiff to wear a one-half inch beard, rendering Plaintiff's TRO motion moot.  (*See* D.E. 48).  Plaintiff's due process and Eighth Amendment claims against Warden Monroe were permitted to proceed.  (D.E. 51).

On June 1, 2015, Defendant Monroe filed the instant motion for summary judgment.  (D.E. 55).

On July 6, 2015, Plaintiff filed his summary judgment response.  (D.E. 59).

On July 17, 2015, Defendant Monroe filed his reply to Plaintiff's response.  (D.E. 60).

## III.   SUMMARY JUDGMENT EVIDENCE.

In support of his motion for summary judgment, Defendant Monroe offers the following:[3]

| | |
|---|---|
| Ex. A: | Affidavit of Warden Carol E. Monroe, Jr. (D.E. 54-2, pp. 2-4); |
| Ex. B: | Affidavit of Warden Gary Currie (D.E. 54-3, pp. 2-5); |
| Ex. C: | Affidavit of Dr. Kathryn Means, TDCJ Director of Qualified Monitoring and Compliance (D.E. 54-4, pp. 2-6); |
| Ex. D: | Plaintiff's TDCJ Housing/Job Assignment History (D.E. 54-5, pp. 3-4); |

---

[3] Defendant's exhibits are filed under seal.

Ex. E:    Relevant Portions of Plaintiff's Classification Records for 2013 (D.E. 54-6, pp. 3-6);

Ex. F:    Plaintiff's Step 1 and Step 2 Grievances, #2013185226 (D.E. 54-7, pp. 3-6);

Ex. G:    TDCJ's Administrative Segregation Plan, effective March 6, 2012 (D.E. 54-8, pp. 3-33);

Ex. H:    TDCJ's Administrative Directive 03.53 (rev. 8), Solitary Confinement, effective May 17, 2012 (D.E. 54-9, pp.3-8); and

Ex. I:    Relevant portions of Plaintiff's Medical Records from June 21, 2013 through August 2, 2014 (D.E. 54-103-32).

In his summary judgment response, Plaintiff also offers Warden Currie's Affidavit (D.E. 59-1, pp. 6-9), Dr. Mean's Affidavit (D.E. 59-1, pp. 11-15), copies of Grievances #2013185226 (D.E.59-1, pp. 21-24), and the TDCJ Administrative Segregation Plan. (D.E.59-2, pp. 2-23).[4]  In addition, Plaintiff offers his own affidavit (D.E. 59-1, pp. 2-4), and a TDCJ Heat Precaution 2013 Memorandum dated June 20, 2013.  (D.E. 59-1, pp. 17-19).

The summary judgment evidence establishes the following:

Plaintiff entered the TDCJ-CID in 2003.  He has been assigned to the MCU since 2007.

From April 12, 2013 to June 21, 2013, Plaintiff was a G4 custody offender at the MCU and was housed in general population at 7 Building, 1 pod, 1 section, 3 row, 18 cell, bottom bunk.  (D.E. 54-5, p. 4).

---

[4] For convenience, reference will be made to Defendant's exhibits where offered by both parties.

On June 21, 2013, Plaintiff, who is a practicing Muslim, attempted to attend a mandatory Jama'ah service in 7 gym. (D.E. 59-1, p. 2, Plaintiff's Aff't at ¶ 1). Sergeant Perez told plaintiff that the Jama'ah service was going to be held in the 7 Building Multipurpose room instead, and Plaintiff questioned Sergeant Perez as to why the location had been moved. (D.E. 59-1, Plaintiff's Aff't at ¶ 2). Sergeant Perez responded that a Catholic service was being held in 7 gym; Plaintiff then demanded to speak to the MCU Chaplin, who is also Catholic. (D.E. 59-1, Plaintiff's Aff't at ¶ 2).

When the Chaplin arrived, Plaintiff accused him of discriminating against the Muslim practitioners by moving their services from the gym and scattering Juma'ah throughout the prison. (D.E. 59-1, Plaintiff's Aff't at ¶ 3). The argument "got heated" and Sergeant Perez called Captain B. Rodriguez and Lieutenant Morales. (D.E. 59-1, Plaintiff's Aff't at ¶ 3). Captain Rodriguez arrived and "immediately started screaming" at Plaintiff. (D.E. 59-1, Plaintiff's Aff't at ¶ 5). Plaintiff told her she was being "unprofessional" and was placing him in "a compromising position." (D.E. 59-1, Plaintiff's Aff't at ¶ 5). Captain Rodriguez then radioed for assistance, including "gas, shields, and sticks." (D.E. 59-1, Plaintiff's Aff't at ¶ 6). Warden Monroe responded over the radio and told Captain Rodriguez "to wait, he was on his way." (D.E. 59-1, Plaintiff's Aff't at ¶ 7).

Warden Monroe arrived and asked Plaintiff what was wrong. (D.E. 59-1, Plaintiff's Aff't at ¶ 8). Plaintiff related that, for Juma'ah services to be valid, it required at least forty (40) male participants, and by changing the location, prison officials had divided the service and scattered members throughout the prison rendering it ineffective.

(D.E. 59-1, Plaintiff's Aff't at ¶ 8).   In addition, Plaintiff pointed out that the Multipurpose room was hot and dirty, there were no prayer rugs, and there was no running water that was also needed for Juma'ah services.  (D.E. 59-1, Plaintiff's Aff't at ¶ 9).  Warden Monroe indicated that the situation was not his fault and that the Muslim Coordinator had not advised him of the needs of the group.  (D.E. 59-1, Plaintiff's Aff't at ¶ 10).   However, Plaintiff did not believe him and told him as much.  (D.E. 59-1, Plaintiff's Aff't at ¶ 11).  Warden Monroe then stated that, if Plaintiff would submit to hand restraints, Warden Monroe would ensure that the other Muslim worshippers would receive cleaning supplies, prayer rugs, and fans.  (D.E. 59-1, Plaintiff's Aff't at ¶ 12).  Plaintiff submitted to the hand restraints.  (D.E. 59-1, Plaintiff's Aff't at ¶ 13).

Warden Monroe advised Plaintiff that he was violating prison rules by refusing to obey orders, inciting others to disobey orders, and being out of place.  (D.E. 54-2, Monroe Aff't at ¶ 5; D.E. 54-5, noting Offenses 24.0, 8.0, and 27.0).  Warden Monroe told Captain Stroleny to escort Plaintiff to prehearing detention (PHD).  (D.E. 54-2, Monroe, Aff't at ¶ 5).  After Plaintiff left the area and order had been restored, Warden Monroe returned to his office.  (D.E. 54-2, Monroe, Aff't at ¶ 5).

There were no cells available in PHD.[5]  (D.E. 59-1, Plaintiff's Aff't at ¶ 14).  Therefore, following his PHD medical examination, Captain Rodriguez and Lieutenant

---

[5] Plaintiff claims that Captain Rodriquez advised Warden Monroe that there was no room in PHD and that Warden Monroe then instructed Rodriguez and Morales to place Plaintiff in solitary.  (D.E. 59-1, Plaintiff's Aff't at ¶ 14).  Warden Monroe denies any involvement concerning the decision where to place Plaintiff in light of PHD being unavailable.  (D.E. 54-2, Monroe Aff't at ¶ 5).

Morales escorted Plaintiff to solitary confinement in 11 Building and Plaintiff was placed in a solitary cell.  (D.E. 59-1, Plaintiff's Aff't at ¶ 14).

The solitary confinement cell was hot and had little ventilation.  (D.E. 59-1, Plaintiff's Aff't at ¶ 15).  Plaintiff's property was brought in, but officials took his fan and radio as the solitary cell had no electrical outlet, unlike the PHD cells.  (D.E. 59-1, Plaintiff's Aff't at ¶ 16; D.E. 54-3, Currie Aff't at ¶ 11).  On the third day in the solitary cell, Plaintiff began to feel dizzy and light-headed from the heat.  (D.E. 59-1, Plaintiff's Aff't at ¶ 17).  He told the floor officer, and the floor officer advised Plaintiff that he had notified the medical department.  (D.E. 59-1, Plaintiff's Aff't at ¶ 17).  Plaintiff went to sleep on the floor.  (D.E. 59-1, Plaintiff's Aff't at ¶ 18).  The next day, he woke up and felt worse.  (D.E. 59-1, Plaintiff's Aff't at ¶ 18).  He ate his meal, but was unable to keep his food down.  (D.E. 59-1, Plaintiff's Aff't at ¶ 18).

Plaintiff was released from the solitary cell on July 4, 2013.[6]  (D.E. 54-5, p. 4).  On July 4, 2013, he was housed in 7 Building where he slept with the window open or the fan on, and the next morning, he was no longer sick.  (D.E. 59-1, Plaintiff's Aff't at ¶ 20).

Before his release, on July 4, 2013, Plaintiff submitted a Step 1 grievance, Grievance No. 2013185226, complaining that prison officials were deliberately indifferent to his health and safety while he was housed in the solitary cell.  (D.E. 54-7,

---

[6] At the *Spears* hearing, Plaintiff testified that he was held in the solitary cell for 18 to 19 days.  In his affidavit, Plaintiff does not offer any dates or state how many days he was held in solitary confinement, but insists that he was still in solitary when he filed his Step 1 grievance, which is dated July 4, 2013.  (*See* D.E. 59-1, Plaintiff's Aff't at ¶ 22).  Plaintiff's Classification History reflects that Plaintiff was released from PHD *status* on July 1, 2013, but his medical records indicate he remained in the solitary cell until July 3, 2014, and was released on July 4, 2014.  (D.E. 54-10, p. 6).  Plaintiff's TDCJ records are the best evidence that he was transferred out of the solitary cell on July 4, 2013.

pp. 3-4).  He complained that there was no meaningful air circulation, that the heat was oppressive, causing him to become dizzy and sick, and he was denied a fan.  (D.E. 54-7, p. 3).  He complained also that he was unlawfully held in the solitary cell and was never charged or found guilty of a disciplinary offense.  (D.E. 54-7, p. 3).  His Step 1 grievance was denied on the grounds that he had been released from the solitary cell.  (D.E. 54-7, p. 4).

On October 13, 2013, Plaintiff filed a Step 2 appeal of Grievance No. 2013185226.  (D.E. 54-7, pp. 5-6).  Plaintiff complained that the grievance response did not address the issues of excessive heat, inadequate ventilation, and a due process violation.  (D.E. 54-7, p. 5).  His Step 2 appeal was denied as being properly addressed at Step 1.  (D.E. 54-7, p. 6).

### Plaintiff's relevant medical records.

On June 21, 2013, Plaintiff was evaluated by medical personnel prior to his placement in PHD.  (D.E. 54-10, pp. 3-6).  Nurse Borders noted no alteration in Plaintiff's mental status and no significant injury, nor was Plaintiff requesting medical attention at the time.  (D.E. 54-10, p. 5).  His heart rate was regular, his speech was normal, and he did not complain of headache or dizziness.  (D.E. 54-10, pp. 3-4).  He was cleared for PHD for allegedly "refusing orders."  (D.E. 54-10, p. 5).

From June 22, 2013 through July 4, 2013, Plaintiff was seen by medical each day that he was held in solitary/PHD.  (D.E. 54-10, p. 6).  No medical complaints were noted during this time.  (D.E. 54-10, p. 6).

On August 27, 2013, Plaintiff was seen by medical personnel for review of his musculoskeletal symptoms and lower bunk assignment.  (D.E. 54-10, pp. 7-13).

On August 28, 2013, Plaintiff was seen in the infirmary for a follow-up visit for complaints of right heel pain.  (D.E. 54-10, pp. 14-15).  Plaintiff reported that he had a history of right ankle rolling and that he had stepped in water in the stairwell, slipped, and his heel had come down on a piece of steel.  (D.E. 54-10, p. 14).  Upon examination, Nurse Practitioner (NP) Hudson noted that Plaintiff is morbidly obese, weighing 343 pounds at 6'2" tall.  (D.E. 54-10, p. 14).  There was tenderness upon palpation to his heel and mid-foot, but he had a full range of motion of the foot and ankle.  (D.E. 54-10, p. 14).  NP Hudson noted a new diagnosis of hypertension.  (D.E. 54-10, p. 14).  The plan was to obtain an x-ray of Plaintiff's foot, order blood work, start him on high blood medication, and prescribe Ibuprofen for his heel pain.  (D.E. 54-10, p. 14).

Plaintiff's next available medical record is dated almost a year later, on July 14, 2014.  (D.E. 54-10, pp. 16-21).  Plaintiff was seen by medical for evaluation following the release of a chemical agent used in a major use of force.  (D.E. 54-10. p. 16).  Notes indicate that on July 12, 2014, Plaintiff had been referred to Mental Health Services with complaints of voices in his head telling him to hurt himself or others, along with signs of agitation and restlessness.  (D.E. 54-10, p. 18).  The mental health provider, Jeffery Carlisle, found that Plaintiff was at an "imminent high risk for a potentially lethal suicide attempt," and his plan was to transfer Plaintiff to crisis management/inpatient care.  (D.E. 54-10, p. 19).

On July 15, 2014, Plaintiff was seen in Mental Health Services.  (D.E. 54-10, pp. 23-26).  Plaintiff told Provider Joe Simental that, following the use of force, he got so angry that he told Provider Carlisle that he was suicidal, and then he laughed.  (D.E. 54-10, p. 23).  Plaintiff admitted he needed to learn to calm himself down but denied suicidal or self-harm thoughts.  (D.E. 54-10, p. 23).  Provider Simental noted that Plaintiff had no history of self-injurious behavior, and he found that Plaintiff was not at a serious risk to himself.  (D.E. 54-10, p. 23).  His plan was to release Plaintiff and let him follow-up on an as-needed basis.  (D.E. 54-10, p. 26).

On July 19, and July 22, 2014, Plaintiff submitted Sick Call Requests (SCR) asking to see a provider because he thought his blood pressure was higher due to the extreme heat.  (D.E. 54-10, pp. 29-30).  He complained of feeling dizzy and nauseated.  (D.E. 54-10, pp. 29-30).

On July 22, 2014, Plaintiff was seen in the infirmary in response to his SCRs.  (D.E. 54-10, p. 27).  Upon examination, Plaintiff's vital signs were all within the normal range with no acute distress noted.  (D.E. 54-10, pp. 27).  The plan was to schedule Plaintiff for follow-up when he complained.  (D.E. 54-10, pp. 270.

On August 1, 2014, Plaintiff was seen in the MCU infirmary for evaluation of his blood pressure as well as complaints about pain to his right elbow following a major use of force.  (D.E. 54-10, pp. 31-32).  PA Echavarry noted that Plaintiff had been prescribed Metoprolol at the Critical Care Clinic for his hypertension and that this medication would be continued.  (D.E. 54-10, p. 31).  PA Echavarry ordered an x-ray of Plaintiff's elbow to evaluate the elbow pain.  (D.E. 54-10, p. 31).

## IV.    SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence, or evaluate the credibility of witnesses.  *Id.*  Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions).   Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V.   DISCUSSION.

### A.   42 U.S.C. § 1983.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United

States.  42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).  A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir. 1983).  There is no vicarious or *respondeat superior* liability of supervisors under section 1983.  *Thompkins v. Belt,* 828 F.2d 298, 303-04 (5th Cir. 1987).  *See also Carnaby v. City of Houston,* 636 F.3d 183, 189 (5th Cir. 2011) (the acts of subordinates do not trigger individual § 1983 liability for supervisory officials).  For a supervisor to be liable under § 1983, the plaintiff must show that (1) the supervisor failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the constitutional violation; and (3) the failure to train or supervise amounts to deliberate indifference to the plaintiff's constitutional rights. *Roberts v. City of Shreveport,* 397 F.3d 287, 292 (5th Cir. 2005). Establishing a supervisor's deliberate indifference generally requires a plaintiff to demonstrate "at least a pattern of similar violations."  *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 427 (5th Cir. 2006) (citations omitted).

### B.    Qualified immunity.

Defendant Monroe moves for summary judgment on the grounds of qualified immunity.  (D.E. 54, pp. 7-14).  *See Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) ("The [qualified immunity] entitlement is an *immunity from suit* rather than a mere defense to

liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") (emphasis in original).

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). To discharge this burden, the plaintiff must satisfy a two-prong test." *Atteberry v Nocana Gen. Hosp.,* 430 F.3d 245, 251-52 (5th Cir. 2005). First the plaintiff must claim that the defendants committed a constitutional violation under current law. *Id.* (citation omitted). Second, the plaintiff must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of. *Id.*

While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory. *Pearson*, 555 U.S. at 236 (receding from *Saucier v. Katz*, 533 U.S. 194 (2001)).

**Step 1: Violations of a constitutional right.**

**(1)     Due process violation.**

Plaintiff claims that his due process rights were violated when he was placed in "solitary confinement" without formal charges brought against him or a hearing to contest those charges.

Generally speaking, due process protections attach only to those punishments that impose an atypical and significant hardship in relation to ordinary incident of prison life, or to those that extend the length or duration of confinement. *Sandin v. Conner*, 515 U.S. 472, 484-86 (1995). The Fifth Circuit has held that "administrative segregation, without more, simply does not constitute a deprivation of a constitutionally cognizable liberty interest." *Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir.1996) (quoting *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir.1995)). Furthermore, the protections afforded by the Due Process Clause do not extend to "every change in the conditions of confinement" which are adverse to a prisoner. *Madison v. Parker*, 104 F.3d 765, 767-68 (5th Cir.1997). Only when a prisoner demonstrates "extraordinary circumstances" may he maintain a due process challenge to a change in his custodial classification. *Sandin*, 515 U.S. at 484.

Cases where segregated confinement is sufficiently atypical to implicate a due process liberty interest involve circumstances that are much harsher than those presented here. For example, in *Wilkerson v. Stalder*, 329 F.3d 431 (5th Cir. 2003), the Fifth Circuit held that due process ***might*** have been violated where the plaintiff had been kept on lockdown status for thirty years. *Id.*, 329 F.3d at 436 (remanding for determination whether such confinement was "atypical" under *Sandin*). In another case, the Supreme Court held that transfer to the Ohio "Supermax" facility implicated a liberty interest, in part, because the conditions there were "more restrictive than any other form of

incarceration in Ohio." *Wilkinson v. Austin,* 545 U.S. 209, 214 (2005).  The *Wilkinson* Court noted that, at the Supermax facility, "almost all human contact is prohibited."  *Id.* at 223.  Ohio Supermax prisoners are kept in single cells with solid metal doors that prevent communication from one cell to another; prisoners take all their meals alone in their cells rather than a common area; and "opportunities for visitation are rare" and are conducted through glass walls.  *Id.* at 223-24.  Ohio Supermax inmates spend 23 hours a day alone in their cells, where a light remains on at all times.  *Id.* at 224.  Moreover, confinement at the Supermax facility is indefinite, and otherwise eligible inmates are disqualified for parole consideration.  *Id.*  These conditions and others were sufficiently extraordinary that the Supreme Court concluded prisoners had a liberty interest in avoiding assignment to the Supermax facility.  *Id.*

The thirty-year confinement and extreme conditions in *Wilkinson* are distinguishable from the present facts.  Plaintiff was held in a solitary cell for ten (10) days.  (D.E. 54-5, p. 4).  Plaintiff admits that on June 21, 2013, he engaged in a heated exchange with Warden Monroe and other prison officials regarding Juma'ah services being moved to the Multipurpose room, ending with Plaintiff submitting to hand restraints.  (D.E. 59-1, Plaintiff's Aff't at ¶¶ 5 – 13).  Plaintiff was advised that he was being placed in PHD and Warden Monroe told Captain Stroleny to charge him with "all appropriate offenses" for his disruptive behavior.   (D.E. 54-2, Monroe Aff't at ¶ 5). Plaintiff was charged with Offense 24, refusing or failing to obey orders; Offense 8.0 riot, inciting other inmates to disobey orders; and Offense 27.0, being out of place.  (D.E. 54-5, p. 4).  Plaintiff was taken for his PHD physical.  (D.E. 54-10, pp. 3-6).  However, PHD

had no cells available, so the decision was made to place Plaintiff in a solitary cell in 11 building.  (D.E. 59-1, Plaintiff's Aff't at ¶ 14).

Plaintiff claims that Warden Monroe instructed the other officers to place Plaintiff in solitary confinement while Warden Monroe contends that decision was left to the escorting officers.  (*Compare* D.E. 59-1, Plaintiff's Aff't at ¶ 14 *with* D.E. 54-2, Monroe Aff't at ¶ 5).  However, this dispute does not raise a genuine issue of a material fact because, even if Warden Monroe ordered that Plaintiff be placed in a solitary *cell*, he was not placed in solitary *confinement*.  The evidence shows that Plaintiff was simply housed in a designated solitary cell, but he was not in solitary confinement.  His classification records note that, while he was placed in the solitary cell, he was in PHD status under the authority of Captain Stroleny.  (D.E. 54-5, p. 4).  Warden Gary Currie, MCU Senior Warden, testifies that "[s]olitary cells are similar to PHD cells in terms of the size, single occupancy, and no air conditioning.  To facilitate with the air circulation, additional fans are placed on the cellblock hallways."  (D.E. 54-3, Currie Aff't at ¶ 8).  Warden Currie continues:

> Even though Mr. Kearney was housed in a solitary cell, he was treated as a PHD offender.  He had access to the same daily activities and privileges as general population offenders but in a different manner.  These activities and privileges included: 1) in-cell meals; 2) showers; 3) non-contact visitation each week; 4)commissary every two weeks for regular purchase items; 5) out-of-cell recreation each day; 6) basic personal property items; 7) access to general library books and law library books; 8) in-cell correspondence courses; and 9) daily access to medical care…. As a level 1 PHD offender, Mr. Kearney was allowed to possess the following additional personal property items: one state-issued razor, commissary items, general library books, in-cell arts and craft items and gender-related items.

(D.E. 54-3, Currie Aff't at ¶ 10).  Plaintiff does not contest Warden Currie's testimony.

Plaintiff objects to the fact that he was held in a solitary cell without being formally charged and found guilty of a disciplinary violation.  Although holding Plaintiff in a solitary cell may be viewed as punitive, it similarly did not "present a dramatic departure from the basic conditions" of his sentence.  *Sandin* makes clear that no particular process is required for punishment that affects only the *quality* of the confinement rather than the *quantity* of confinement.  *Id.*  Atypical and significant hardships are those deprivations which "clearly impinge on the duration of confinement." *Orellana v. Kyle*, 65 F.3d 29, 31-32 (5th Cir. 1995) (quoting *Sandin*, 515 U.S. at 483-84). Plaintiff has failed to make any showing that the time spent in a solitary cell extended his total time in prison or otherwise resulted in "atypical, significant hardships," and his mere placement in a solitary cell under PHD status, even without being charged or found guilty of an offense, fails to state a cognizable due process claim.  *See e.g. Samford v. Staples*, 249 Fed. Appx. 1001, 1004 (5th Cir. 2007) (temporary solitary confinement, disciplinary sanctions of curtailed recreation and commissary privileges, assignment of extra duty, and a reduction in his classification status did not represent atypical or significant hardships and did not infringe upon a constitutionally protected liberty interest); *Clark v. Stalder,* 103 F.3d 126 (5th Cir. 1996) (unpublished) (citing *Bulger v. U.S. Bureau of Prisons,* 65 F.3d 48, 49 (5th Cir. 1995) ("prison classification and eligibility for rehabilitation programs are not directly subject to 'due process' protections").  Plaintiff's allegations fail to raise cognizable due process claims.

(2)     **Eighth Amendment.**

Plaintiff claims that the conditions in the solitary cell violated the Eighth Amendment.  He claims that the cell was excessively hot and humid, that he was denied a personal fan, and that he became dizzy and faint because of the heat.

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  Prison officials must provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; and take reasonable measures to guarantee the safety of the inmates.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth Amendment.  *Hudson v. McMillian*, 503 U.S. 1, 8-10 (1992); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement.  First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment.  *Hudson*, 503 U.S. at 8.  The challenged condition must be "extreme."  Id. at 9.  While an inmate "need not await a tragic event" before seeking relief," *Helling v. McKinney*, 509 U.S. 25, 33 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety.  *Id.* at 35.  Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury will actually be caused by exposure to [the

challenged condition of confinement]. *Id.*   It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk. *Id.*   In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. *Id.* at 36.   The Eighth Amendment thus guarantees that prisoners will not be "depriv[ed] ... of the minimal civilized measure of life's necessities." *Rhodes*, 452U.S. at 347.

Second, the prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. *Hudson*, 503 U.S. at 8.   The proper standard is that of deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).   Negligence does not suffice to satisfy this standard, *id.* at 305, but a prisoner need not show that the prison official acted  with "the very purpose of causing harm or with knowledge that harm would result." *Farmer*, 511 U.S. at 835.   In defining the deliberate indifference standard, the Farmer Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.   Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted."  Id. at 844.

Plaintiff claims Warden Monroe knew he was in a solitary cell and knew that he was exposed to extreme heat and dangerous temperatures that made him sick. However, Warden Monroe testifies that, after Plaintiff was escorted away from the Multipurpose room, he had no knowledge of where Plaintiff was housed and was not made aware of his complaints until he received Plaintiff's Step 1 grievance. (D.E. 54-2, Monroe Aff't at ¶ ¶ 5-6). However, even if Warden Monroe was aware of Plaintiff's allegation that he was placed in a hot, humid cell that made him feel dizzy and nauseous for several of fourteen days, this allegation does not rise to the level of an Eighth Amendment violation. In support of his motion for summary judgment, Warden Monroe offers the affidavit of Dr. Kathryn Means who is currently the TDCJ Director of Quality Monitoring and compliance. (D.E. 54-4, Means Aff't at ¶ 4). Dr. Means testifies that, as a consequence of being in PHD, Plaintiff was seen daily by medical staff June 21, 2013 through July 4, 2013. (D.E. 54-4, Means Aff't at ¶ 7). She testifies that: "Documentation reflects that every day he was alert and oriented to person, place, and time. His appearance, behavior and verbalization were appropriate to his situation. He had no health complaints and there was no indication of new trauma." (D.E. 54-4, Means Aff't at ¶ 7). (*See also,* D.E. 54-10, p. 6, Plaintiff's medical record, Solitary/Prehearing Flow sheet showing that Plaintiff was seen by medical staff each day from June 21, 2013 through July 3, 2013). In addition to being seen by medical each day, Plaintiff did not submit a SCR while housed in the solitary cell complaining of dizziness or nausea from the heat. Moreover, Plaintiff admits that, by the first night he was released from the solitary cell, he no longer felt ill. (D.E. 59-1, Plaintiff's Aff't at ¶ 20). In addition, his subsequent medical records

do not show that he later complained of any alleged injury from his time in the solitary cell.  Being uncomfortable for 14 days in a hot stuffy cell, while simultaneously being let out of his cell for recreation and showers, and checked by medical daily, is not the type of condition that "shocks the conscious of mankind" or equates to a denial of the minimal civilized necessities of life. [7]  *See Hutto v. Finney,* 437 U.S. 678, 686-87 ("the length of confinement cannot be ignored. … A filthy overcrowded cell … might be tolerable for a few days and intolerably cruel for weeks or months.").

Plaintiff's placement in a solitary cell for fourteen days, while provided privileges and daily medical attention, did not violate the Eighth Amendment.

**Step 2 – Objective reasonableness.**

Warden Monroe argues that, even if the Court were to find Plaintiff's constitutional rights were violated, he is entitled to qualified immunity because his actions were objectively reasonable in light of the law that was clearly established at the time of the events forming Plaintiff's lawsuit.  *Anderson,* 483 U.S. at 639-40; *Freeman v. Gore,* 483 F.3d 404, 410-11 (5th Cir. 2007).  The second step in the qualified immunity analysis is best understood as two distinct inquiries: (1) what was the clearly established law at the time Plaintiff was placed in a solitary cell without a disciplinary hearing and held there for fourteen days; and (2) were Warden Monroe's actions objectively reasonable in light of that clearly established law?  *See Hare v. City of Corinth, Miss.,*

---

[7] This Court is aware of, and sympathetic to, the complaints of extreme heat by inmates the McConnell and Garza Units in Beeville, Texas.  *See Hinojosa v. Livingston,* 2014 WL 1276190 (S.D. Tex., Mar. 27 2014) (unpublished) (denying TDCJ officials' motion to dismiss wrongful death action of family of inmate with pre-existing conditions making him more susceptible to excessive heat); (*Blackmon v. Kukua*, 758 F. Supp. 2d 398 (S.D. Tex. 2010) (denying prison officials' summary judgment where Garza unit dorms exceeded 100 degrees for 27 days).

135 F.3d 320, 326 (5th Cir. 1998).  At the summary judgment stage, a plaintiff must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them." *Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir. 1993).

It was well established law on June 21, 2013 that no due process is required or owed to an offender before he is placed in administrative segregation.  *Sandin,* 515 U.S. 484-86*; Hernandez v. Velasquez,* 522 F.3d 556, 562, 562-63 (5th Cir. 2008) (reiterating that prison officials should be afforded the "widest possible deference" in classifying prisoners' custodial status as necessary to maintain security and preserve internal order, and in the specific instance of administrative segregation, concluding it to be "an incident of ordinary prison life," and as such, never a ground for a constitutional claim).  In light of this clearly established rule, Warden Monroe acted reasonably when Plaintiff was placed in a type of administrative segregation, PHD status, following the dispute over the Multipurpose room.  When the PHD cells were unavailable, it was reasonable to place Plaintiff in a solitary cell, where he remained under PHD status.  (D.E. 54-3, Currie Aff't at ¶ 10).  Warden Monroe's actions were objectively reasonable.

Plaintiff claims that Warden Monroe knew his solitary cell was hot and humid in violation of the Eighth Amendment.  However, as previously discussed, while the Constitution forbids inhumane prisons, it does not mandate comfortable ones.  *Farmer,* 511 U.S. at 832, *quoting Rhodes v. Chapman,* 452 U.S. 337, 349 (1981).  In this case, the conditions complained of, heat and humidity, were not so serious as to deprive Plaintiff

of the minimal civilized measures of life's necessities.  *Herman v. Holiday,* 238 F.3d 660,

664 (5th Cir. 2001).  To the contrary, as a PHD status prisoner, Plaintiff had daily out-of-

cell recreation and showers.  (D.E. 54-3, Currie Aff't at ¶ 10).  There were fans in the hall

to help with air circulation.  (D.E. 54-3, Currie Aff't at ¶ 8).  He was assigned to PHD for

a finite amount of time and released.  (D.E. 54-5, p. 4).  All of these factors establish that

Plaintiff's confinement in the solitary cell under PHD status did not violate the Eighth

Amendment, and Warden Monroe's actions were objectively reasonable under the clearly

established law.

## VI.   CONCLUSION.

Warden Monroe has demonstrated that there is no genuine issue of a material fact

that he did not violate Plaintiff's due process or Eighth Amendment rights concerning his

placement in a solitary cell for fourteen days.   Accordingly, it is respectfully

recommended that the Court grant Warden Monroe's motion for summary judgment

(D.E. 54) and dismiss with prejudice Plaintiff's claims against this Defendant.

The Court should not enter final judgment because Plaintiff's RLUIPA claim

regarding his right as a Muslim to wear a beard remains pending.

Respectfully submitted this 13th day of August, 2015.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).